IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| SOELECT INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:24-cv-168 |
| | ) | |
| REDEX SAS, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Lindsey A. Freeman, United States District Judge

This breach-of-contract case largely hinges on a single question: Did Soelect Inc. ("Soelect") and Redex SAS ("Redex") enter into their contract with the intent that Redex would complete its entire course of performance on or before March 2, 2024? The record demonstrates that the parties disagreed on the answer to that question from the start. To be sure, their contract is brief, so their disagreement is understandable. But at this stage— on a motion for summary judgment—it is not the province of this Court to determine which party's version of the story it believes. Because the parties' contract is ambiguous as to whether Redex was required to complete performance on or before March 2, 2024, and that ambiguity cannot be resolved without weighing evidence and crediting witness testimony, Redex's motion for summary judgment will be DENIED.

### I.    Soelect and Redex Enter into the Contract.

Soelect is a technology company incorporated in Delaware and headquartered in Greensboro, North Carolina that manufactures material to be used in lithium batteries for electric vehicles.  Dkt. 28-3 at 23:12-24:5.  When producing lithium-ion batteries, the raw lithium metal typically needs to be passed through an extruder to make it thin enough to be used in electric car batteries.  Dkt. 28-1 at 167:17-168:15.  After years of buying previously-extruded lithium-ion foil from third-parties, Soelect ultimately decided to cut costs by purchasing its own extruder to process raw lithium metal in-house.  It settled on the PLE2 Extrusion Press (the "Machine"), a product offered by Redex, a French company that specializes in designing and manufacturing precision machinery for metal processing.  *See* Dkt. 28-3 at 7:18-8:1; Dkt. 25-1 ("Contract") at 1.[2]  On October 20, 2022, Soelect and Redex executed a purchase order (the "Contract") for Redex to manufacture and supply to Soelect the Machine for a price of around 1.1 million euros (about 1.3 million U.S. dollars).  Contract at 1, 6.

---

[1] Because Redex moves for summary judgment on both its counterclaims and Soelect's claims, the Court recounts the facts in the light most favorable to Soelect, the nonmovant. *See Est. of Jones by Jones v. City of Martinsburg*, 961 F.3d 661, 664 (4th Cir. 2020).

[2] All pin citations to exhibits filed in connection with Redex's motion for summary judgment refer to the exhibits' internal document page number, Bates number, or contract provision.

The Contract outlines the scope of the parties' obligations at only a high level. It appears that the partes' performance was to proceed in sequential steps, although the parties dispute the exact order of performance. *See* Dkt. 27 at 3-4; Dkt. 28 at 5-6. The Contract first requires that Redex ask Soelect to conduct a so-called "Preliminary Inspection" to occur "[o]ne month before shipment" of the Machine. Contract § 2.1.1. It further states that "[t]he equipment shall be shipped **only after** preliminary inspection by Soelect." *Id.* (bolded and underlined in original). Next, the Contract explains that Soelect was to "proceed" with a Factory Acceptance Test ("FAT"). *Id.* § 2.1.2. The parties agree that the purpose of FAT was to test whether the mechanical and electrical components of the Machine functioned properly and safely. *See* Dkt. 25-3 at 49:4-50:13; Dkt. 25-5 at 25:9-14, 36:23-37:14; Dkt. 28-3 at 21:16-22. They also agree that Soelect was required to preside over FAT. *See* Contract § 2.2.1 (the FAT "shall proceed under inspection by Soelect's delegate ….").

The Contract further obligates the parties to conduct an "Installation," Site Acceptance Test ("SAT"), and "Training" once the Machine was delivered to Soelect's facilities in North Carolina. *Id.* §§ 3.1-3.3. According to the Contract, Soelect and Redex were to jointly "check all parts of the machine, then begin to install." *Id.* § 3.1.1. Thereafter, "Soelect shall proceed to the SAT," *id.* § 3.1.2, whereby it would conduct two tests of the Machine, a Preliminary Site Acceptance Test ("PSAT") and Final Site Acceptance, *see id.* § 3.2.1; *see also id.*, App'x C1, C2. The contract sets the "[d]uration" for

3

SAT as "[u]p to 30 personnel days."  *Id.* at 2.  The parties would finally engage in training concerning how to properly operate the Machine upon completion of SAT.  *Id.* § 3.3.1.

The critical provision for purposes of this dispute concerns Redex's so-called "lead time" for the project. *Id.* at 2.  The Contract contained the following language: "Lead time: 12-16 months after receipt of order and down payment." *Id.*  The term "lead time" is never defined in the Contract, but the Contract does clarify that Soelect was to pay "30% of the order value … as a down payment" to be "due upon receipt of the invoice," indicating that the "lead time" would begin sometime after Soelect received and paid an invoice from Redex. *Id.*  Both parties agree that the "lead time" provision established a timeframe for Redex's performance, although they dispute what exactly Redex needed to complete within that window and whether Redex was required to strictly comply with the sixteen-month deadline.  *See* Dkt. 27 at 3 ("The only contractual time frame set forth in the Contract was the lead time of 12-16 months for delivery."); Dkt. 28 at 14 (arguing that the parties understood "lead time" to encompass Redex's completed performance).

Other relevant language in the Contract appears under the heading "Development agreement*."  See* Contract § 3.4.  The Contract states that the parties "agree to work together, using their best endeavors to obtain the performance guarantees given in 'Appendix C2,'" which concerns Final Site Acceptance for the Machine, "within 9 months of delivery to the Soelect facility." *Id.* § 3.4.1.  It further adds that "[i]f further visits to site are required by [Redex], over and above the 30 days included in the contract, then special

4

reduced rates will apply" to pay certain Redex employees for assistance at Soelect's facilities. *Id.* § 3.4.3. The Contract confers on Soelect "the right to terminate the development agreement early and release the final payment term." *Id.* § 3.4.4.

## II.     The Parties Begin Performance.

Redex invoiced Soelect for the Machine soon after the parties entered into the Contract, and Soelect confirmed receipt on October 25, 2022. *See* Dkt. 28-7 at RED0154. Soelect remit its deposit for the Machine to Redex on November 2, 2022. *See* Dkt. 28-3 at 24:18-20. The parties agree that the "lead time" began when Soelect paid Redex its down payment, so the sixteen-month period would have expired on March 2, 2024. *See id.* at 24:21-25:1; *see also* Dkt. 27 at 3; Dkt. 28 at 6-7.

The parties' confusion over the timing of Redex's performance arose almost immediately after the "lead time" supposedly began. In a November 4, 2022, email, Redex's Business Development Manager, Stephen Tighe, explained to Soelect that he "expect[ed] the factory acceptance" of critical items for the Machine "to be in France in January 2024," permitting "a preliminary acceptance in March 2024." Dkt. 28-7 at RED0153. Jin Cho, Soelect's Founder and CEO, responded to Tighe's email surprised by Tighe's proposed schedule. *Id.* According to Cho, Soelect promised its investors that it would "complete extrusion installation" in North Carolina by the end of 2023, asking another Soelect employee on the email chain if he had misunderstood something. *Id.* Cho

added, "We cannot accept the schedule. If Redex needed 17 months for the preliminary test then, I don't think we chose Redex." *Id.*

At first, Tighe appeared to resist Cho's understanding of the Contract. In a response email, Tighe copied "from [Redex's] quote relating to delivery time," which he claimed stated that delivery time would typically be "12-16 months after receipt of order and down payment," but "exact delivery times depend upon the workload and will be confirmed at order placement." *Id.* at RED0152 (citation modified). Although Tighe disagreed with Cho, he warranted that Redex would "look at the possibility of pulling [the project] forward" and do its "best to fulfill [Soelect's] requirements." *Id.*

In his next email on the chain, Tighe appeared to capitulate. In response to an email from Soelect requesting a proposed schedule from Redex, Tighe stated unequivocally that "[w]ork *will be completed* within 16 months as requested by Jin." *Id.* at RED0151 (emphasis added). The schedule he attached to the email indicates that "delivery to site" of the machine would occur sometime in December 2023, "preliminary acceptance test" would occur in January 2024, and "final acceptance test" would occur by March 2024. Dkt. 28-2. Tighe's email echoes the deadlines in Redex's proposed schedule. *See* Dkt. 28-7 at RED0151. This reassurance apparently satisfied Soelect because the parties agree that they communicated only sporadically over the next year. *See* Dkt. 27 at 5 ("Between November 2022 and October 2023, there was little communication from

6

Soelect regarding the timing of delivery of the Machine."); Dkt. 28 at 6-8 (recounting little

communication between the parties between November 2022 and October 2023).

**III.     Delays Disrupt Performance in Accordance with the November 2022 Schedule.**

After months of relatively little communication, the business relationship between

the parties began to deteriorate around September 2023. At that time, Redex experienced

delays on account of a third-party manufacturer involved in production of the Machine,

Trinks Inc. ("Trinks"). The Machine has two component parts, a hydraulic press and an

exit section. Dkt. 28-3 at 93:13-24. Redex contracted out manufacturing of the hydraulic

press to Trinks. *See* Dkt. 28-13 (invoice between Redex and Trinks for a lithium extrusion

press); *see also* Dkt. 28-3 at 17:9-15 (explaining that Trinks separately assembles the

hydraulic press). The November 2022 schedule indicates that Redex anticipated that

Trinks would deliver the hydraulic press to its facilities sometime in October 2023. *See*

Dkt. 28-2. But Trinks experienced delays, which it confirmed to Redex when Redex

visited Trinks' factory in September 2023. *See* Dkt. 28-14. A memorandum prepared by

Redex following the visit appears to state that the press "will be ready by start to mid of

October," Dkt. 28-14 at RED0011, which Tighe later clarified meant that the hydraulic

press would be ready to *ship* to Redex in October 2023, Dkt. 28-3 at 39:5-13. Accordingly,

Redex was now far behind its timeline under the November 2022 schedule and without

one of the component parts necessary to complete the Machine. Indeed, under the

November 2022 schedule, Redex was slotted to *receive* the hydraulic press from Trinks in

7

October 2023 and begin final assembly of the Machine by the end of that month. *See* Dkt. 28-2.

Facing the prospect that it would not receive the hydraulic press until mid-October at the earliest, Redex asked Soelect for more time. Tighe sent Soelect's Business Development Manager, John Lee, an updated schedule on November 10, 2023. *See* Dkt. 28-16 at RED0124. According to Tighe, he intended for the updated schedule to replace the schedule he provided to Redex in November 2022. Dkt. 28-3 at 72:23-73:6. The updated schedule placed the FAT for January 18, 2024, at Redex's facilities in France. Dkt. 28-17. Delivery to Soelect would be completed sometime in February 2024, but final testing on the machine was proposed to be completed April 5, 2024, outside of the parties' sixteen-month "lead time." *Id.*

Only a week-and-a-half later, Trinks confirmed by email that the hydraulic press shipped from its facilities on November 20, 2023—far behind its initial quote—with an anticipated delivery to Redex on January 1, 2024. Dkt. 28-18. This left Redex in a bind. Even if Trinks' delivery was timely, that still only left Redex two-and-a-half weeks to complete assembly of the Machine in preparation for FAT under the revised timeline it had just proposed to Soelect. *See* Dkt. 28-17 (setting January 18, 2024, as the date for "Factory acceptance test FAT at Redex France").

On December 1, 2023, Tim Price, Soelect's Chief Financial Officer, emailed Ullrich Speer, Redex's Vice President of Sales and Marketing, "to address a significant concern

8

regarding our recent business dealings." Dkt. 28-20 at RED0266. He continued, "Regrettably, it has come to our attention that the delivery schedule outlined in the agreement has yet to be adhered to, resulting in a substantial delay exceeding 16 months." *Id.* at RED00267. He formally notified Redex of its "evident" breach of the Contract and "proposed [a] video meeting" to discuss. *Id.* Speer responded, explaining that Redex had experienced delays because of "our supplier," which "did not tell the truth to us" about when it could deliver one of the Machine's component parts. *Id.* at RED0265. Speer recounted what he believed to be the parties' course of dealing with respect to Redex's time for performance, explaining that the updated schedule sent on November 10, 2023, was merely intended to "go[] back to the initial program with the FAT in January and preliminary acceptance in March," which he contended was the schedule "[w]hen the [Contract] had been signed." *Id.*

Redex followed up on Speer's email by again proposing a revised schedule. The schedule would place delivery of the Machine to Soelect—not completion of SAT—before March 2, 2024. *Id.* at RED0261. Price responded that the schedule was unacceptable because it "still leaves Soelect without a working extrusion machine in the agreed upon timeframe, which will have significant negative consequences to Soelect, our investors, and our customers." *Id.* at RED0259. He requested that Redex "provide final confirmation by the end of day on Monday, December 18th whether Redex can meet the

9

original timeline with a project completion (pass final SAT) by March 2, 2024." *Id.* at RED0260.

Tighe responded on December 20, 2023, explaining that the Contract only required Redex to *deliver* the Machine within the sixteen-month "lead time" (even if not fully functional). *Id.* at RED0257. He clarified that the Contract "includes a development phase lasting up to 9 months from delivery to final acceptance (Section 3.4)," adding that "installation has to be carried out by Soelect with supervision from Redex." *Id.* According to Tighe, "[t]his [was] one of the main reasons why lead times are always either ex-works or delivery to a specified place." *Id.* At his deposition, Tighe explained that the term "ex-works" refers to product acceptance "available at the door of the factory which has produced the machine" rather than "delivered to the final customer." Dkt. 28-3 at 76:9-20.

## IV. After Offering an Amendment, Soelect Formally Terminates the Contract.

Lacking reassurance from Redex that it would complete performance by March 2, 2024, Price sent a letter to Speer on December 22, 2023, formally requesting that Soelect and Redex sign an amendment to the Contract. Dkt. 28-10. The proposed amendment imposed several "conditions" on Redex, which purported to augment the dates for various stages of Redex's performance, including pushing certain milestones outside of the "lead time" window. *Id.* at SOELECT_000050. In exchange, Soelect demanded that Redex agree to a revised payment schedule. *Id.* at SOELECT_000051.

10

Redex refused to sign the amendment, *see* Dkt. 25-10; Dkt. 25-11 at RED0238, so the parties met a final time on January 9, 2024, which is memorialized in an email from Speer, *see* Dkt. 25-12. At the meeting, Price stated that if the parties did not reach an agreement on a revised schedule by January 12, 2024, Soelect would rescind the Contract and request a refund of its down payment. *See* Dkt. 28-21 at RED0080. Redex did not provide assurance within that window. *See* Dkt. 28-8 ¶ 11.

Redex finally received delivery of Trinks' hydraulic press on January 15, 2024. *See* Dkt. 28-19. The next day, Tighe emailed Soelect to explain that Redex was in the process of preparing for FAT. Dkt. 28-22. He again emailed on January 17, 2024, with a photograph of the Machine, Dkt. 28-23, explaining that Redex had "finished assembling the extrusion press," *id.* at SOELECT_000011. He added that Redex "would appreciate a decision urgently regarding the FAT visit so that we can plan accordingly." *Id.* Determining from the photograph that the Machine was still far from operable, complete, or ready for FAT, Dkt. 28-1 at 58:6-61:15; *see also* Dkt. 28-23, Soelect provided Redex with a formal notice of termination of the Contract, Dkt. 28-24.

On February 29, 2024, Soelect filed this lawsuit seeking refund of its down payment to Redex and other damages arising out of Redex's alleged breach of the Contract. *See generally* Dkt. 1. Redex filed an answer in May 2024 and counterclaimed against Soelect, asserting that Soelect had instead breached the Contract by refusing to proceed with FAT at Redex's facilities. *See generally* Dkt. 7. The parties completed

11

discovery on December 19, 2025, *see* Dkt. 20-1, and, thereafter, Redex filed a motion for summary judgment on its counterclaims and Soelect's claims, *see* Dkt. 25.[3] The parties have briefed that motion, Dkts. 27-29, and it is thus ripe for this Court's review. For the reasons stated below, Redex's motion for summary judgment is denied.

## STANDARD OF REVIEW

The Court may grant summary judgment only if it determines that the movant—here, Redex—"shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it may affect the outcome of the parties' dispute, and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When reviewing the record on summary judgment, the Court is bound to construe the facts and "all reasonable inferences drawn therefrom" in the light most favorable to the nonmovant—here, Soelect. *See Aleman v. City of Charlotte*, 80 F.4th 264, 283-84 (4th Cir. 2023). Importantly, the Court may not credit

---

[3] As Soelect points out, Dkt. 28 at 19 n.12, Redex did not move for summary judgment in accordance with this Court's Local Rules, *see* L.R. 56.1. "Any party who intends to file a motion for summary judgment … must file and serve notice of intention to file a dispositive motion within 14 days following the close of the discovery period." *Id.* 56.1(a). Redex never filed a notice of intent to file a dispositive motion within fourteen days of the close of discovery on December 19, 2025. When no notice is provided, the motion "will not be reached by the Court prior to trial unless the court determines that its consideration will not cause delay to the proceedings." *Id.* 56.1(g). While the Court concludes that no delay will be caused by considering Redex's motion, it is reminded to review this Court's Local Rules before future filings, especially as the parties' scheduled trial date quickly approaches.

the movant's contrary evidence, weigh the evidence presented by either party, or resolve factual disputes in the movant's favor, even if the jury may be inclined to do so. *Id.* at 284. Nor is it the province of the Court at the summary judgment stage to assess the credibility of witnesses. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). Summary judgment is thus inappropriate if, viewing the evidence in the light most favorable to Soelect, a reasonable jury could return a verdict in its favor. *See Anderson*, 477 U.S. at 248.

### ANALYSIS

Redex moves for summary judgment, asserting several reasons why it is entitled to judgment in its favor, but all its arguments suffer from the same fatal flaw: They presume that the parties' contract is unambiguous as to Redex's timing of performance. It is not. To reach its conclusion, Redex consistently construes the facts in its own favor, ignores contrary evidence, and tries to discredit the testimony provided by Soelect's witnesses. Because granting Redex summary judgment would require the Court to misapply the summary judgment standards, Redex's arguments will be rejected.

The parties present two competing narratives of the Contract and the events between the parties. Redex's arguments can generally be summarized as follows. The Contract unambiguously required Redex to complete only FAT and delivery of the Machine within the sixteen-month "lead time," *see* Dkt. 27 at 12; Dkt. 29 at 2, 4-6, and granted Redex an additional nine months to complete other performance obligations,

13

such as SAT, after delivery to Soelect's facilities, Dkt. 27 at 4; *see also* Contract § 3.4.1. Accordingly, in Redex's estimation, the Contract effectively granted Redex *twenty-five* months to complete its entire performance. Because Redex was ready, willing, and able to meet those performance deadlines, Soelect breached the Contract by unreasonably terminating and refusing to participate in FAT, a condition-precedent to delivery. Dkt. 27 at 13-14; Dkt. 29 at 1-4. In the alternative, Redex argues that because the Contract did not explicitly require strict compliance with performance deadlines, failure to abide by the sixteen-month "lead time" was not a material breach of the Contract. *See* Dkt. 27 at 15-17. Therefore, Redex continues, it is entitled to summary judgment on its counterclaims *and* Soelect's claims because Soelect breached the agreement first, so Redex was relieved of its return performance. *Id.* at 18-19.

Soelect, for its part, maintains a different narrative. While it does not cross-move for summary judgment, it argues that the Contract is at least ambiguous as to whether Redex was required to complete its entire performance within the sixteen-month "lead time." *See* Dkt. 28 at 13-17. It adds that the parties' course of performance supports its interpretation. *Id.* at 16-17. And it asserts that Redex's contrary interpretation of the agreement can only be accepted through recourse to disputed material facts and impermissible inferences in Redex's favor at the summary judgment stage. *See id.* at 10-13.

The Court agrees with Soelect that the Contract is ambiguous and that the ambiguity must be resolved by a jury. The Court first assesses unanswered issues of governing law. Then it addresses the parties' dueling interpretations of the Contract, concluding that the Contract is ambiguous as to Redex's deadline for performance. The Court then rejects Redex's arguments for why summary judgment is appropriate in this case.

## I. The Court Will Apply North Carolina Law and the UCC to this Contract Dispute.

Before the Court can proceed to the merits of Redex's summary judgment motion, the Court must address two preliminary questions left unaddressed by the parties, both concerning the law applicable to their dispute. Neither party addresses what forum's law applies to the Contract, appearing to simply assume that North Carolina law supplies the rules of decision. Additionally, Redex at times argues that Article 2 of the Uniform Commercial Code ("UCC") supplies the governing law where applicable, although Soelect simply applies North Carolina common law without even addressing the UCC.[4]

North Carolina law applies, and the parties have waived any arguments to the contrary. In diversity cases such as this one, the Court must determine the applicable law to the parties' dispute. That requires that the Court look at the choice-of-law rules of the forum state—here, North Carolina. *See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S.

---

[4] North Carolina adopted the UCC, including Article 2, through Article 25 of the General Statutes. *See* N.C. Gen. Stat. § 25-2-102.

487, 496 (1941).  Under North Carolina law, a contract is governed by North Carolina law if the underlying transaction bears an "appropriate relation" to the state.  N.C. Gen. Stat. § 25-1-301(b).  North Carolina courts interpret the phrase "appropriate relation" to impose the law of the state with the most significant relationship to the contract, usually the "state where the contract was made or, in certain instances, by the law of the state of performance."  *Boudreau v. Baughman*, 322 N.C. 331, 368 S.E.2d 849, 854 (1988).

The Contract does not contain an express choice-of-law provision.  Nor is it clear based on the record whether the Contract was formed in North Carolina.  And it appears that performance was to occur both in France and North Carolina, so arguably either forum's law could apply.  But the parties implicitly agree that North Carolina law governs their agreement by both applying it in their briefs.  Choice-of-law issues may be waived, and failure to advance the argument that another forum's law should apply to a dispute waives that objection.  *See Wiener v. AXA Equitable Life Ins. Co.*, 58 F.4th 774, 779-81 (4th Cir. 2023) (observing that every federal court of appeal has concluded choice-of-law issues may be waived by the parties and holding that a party waived any choice-of-law issues by failing to expressly raise them).  Because the parties have waived the argument that the law of France or another forum should apply to this dispute, the Court will apply North Carolina law.

Additionally, Redex is correct that, where applicable, the Contract is governed by the UCC, rather than North Carolina common law, because it is primarily a contract for

16

the sale of goods. The Contract is a mixed contract, providing for the sale of goods (*i.e.*, sale of the Machine) and services (*i.e.*, manufacturing, delivery, installation, and training). *See, e.g.*, Contract at 1 (outlining "equipment" to be supplied by Redex, including the Machine); *id.* at 2 (outlining "services" to be provided by Redex). North Carolina courts look to the primary purpose of a mixed contract to determine whether it falls within the scope of the UCC. *See Hensley v. Ray's Motor Co. of Forest City, Inc.*, 158 N.C. App. 261, 580 S.E.2d 721, 724 (2003) (adopting the predominant factor test); *see also* N.C. Gen. Stat. § 25-2-102. In assessing a contract's primary purpose, the Court considers three factors: (1) the language of the parties' contract; (2) the nature of the supplier's business; and (3) the intrinsic worth of the materials involved. *RMS Tech., Inc. v. TDY Indus., Inc.*, 64 F. App'x 853, 855 (4th Cir. 2003) (citing *Coakley & Williams, Inc. v. Shatterproof Glass Corp.*, 778 F.2d 196, 197 (4th Cir. 1985)). If the "predominant factor of a contract is the rendition of services with the sale of goods incidentally involved, the UCC is not applicable," but if "the predominant factor of the contract is the sale of goods with the provision of services incidentally involved, the UCC controls." *Hensley*, 580 S.E.2d at 724.

Applying the three factors above, the Court concludes that the provision of services is incidental to the sale of goods. The Contract itself is split between outlining the good to be sold—the Machine—and the services to be rendered. *See* Contract at 1-2. But it is entitled "Purchase Order," *see id.* at 1 (quotation modified), and the Contract's appendixes outline the specifications of the Machine and tests to ensure its components

17

are working, *see generally id.*, App'x A-C2, suggesting that the parties were primarily concerned with the Machine itself, rather than the services to be rendered in connection with it. The record also reveals that Redex is primarily in the business of designing, manufacturing, and selling precision machinery. *See, e.g.*, Dkt. 28-3 at 7:18-8:9. That the Machine was to be designed according to custom specifications does not render the Contract a services contract. *See DeMaria Bldg. Co., Inc. v. Lab'y Design, Equip. & Installations LLC*, No. COA24-882, 2025 WL 1703953, at *4-5 (N.C. Ct. App. June 18, 2025) (contract for design, manufacturing, sale, and installation of custom items was still governed by UCC). And the intrinsic value of the Machine was its fair market value when complete. Indeed, the parties' dispute is before this Court because, to Soelect, the Machine's value was substantially impaired unless it was completed and operable by March 2, 2024, at the latest. *See, e.g.*, Dkts. 28-7, 28-10. All three factors thus indicate that the primary purpose of the Contract was for the sale of goods.

Having addressed the issues regarding governing substantive law, the Court proceeds to the merits of Redex's motion. The Court will begin by addressing Redex's counterclaims before proceeding to a short analysis of Soelect's claims. Because Redex's motion is denied to the extent that it seeks summary judgment on Soelect's claims for much the same reason as its motion is denied to the extent it seeks summary judgment on its own counterclaims, most of the Court's analysis focuses on Redex's counterclaims.

18

**II.** **The Contract is Ambiguous as to Redex's Deadline for Performance, and that Ambiguity Creates Genuine Disputes of Material Fact Precluding Summary Judgment on Redex's Counterclaims.**

The parties' contract is ambiguous as to when Redex was required to provide Soelect with the complete and operable Machine. That ambiguity cannot be resolved without reference to disputed extrinsic evidence of the parties' intent. Viewing the facts in the light most favorable to Soelect, a reasonable jury could conclude that the Contract required Redex to complete its performance on or before March 2, 2024. Summary judgment is therefore inappropriate.

Thanks to their dueling interpretations of the Contract, Soelect and Redex agree that a breach occurred, but they disagree about which party failed to perform its obligations. Redex argues that the Contract unambiguously granted it twenty-five months to complete its course of performance because it granted Redex an additional nine months to complete certain performance obligations, such as SAT, so long as it delivered the Machine to Soelect within the sixteen-month "lead time." *See* Dkt. 27 at 4, 12; Dkt. 29 at 2, 4-6. Redex asserts that Soelect breached the Contract due to its failure to participate in FAT, a condition-precedent to Redex's return performance to deliver the Machine. Dkt. 27 at 13-14; Dkt. 29 at 1-4. On the other side, Soelect contends that the Contract is ambiguous as to whether Redex was required to complete its entire performance within the sixteen-month "lead time," adding that the nine-month language in the "Development agreement" was unrelated to the total lead-time set out under the

19

Contract.  *See* Dkt. 28 at 13-18.  Soelect views its decision to terminate the Contract as a permissible course of action considering Redex's anticipatory repudiation that it could not meet the deadlines set forth in the Contract.  *See* Dkt. 28 at 3.  A determination as to which party breached the Contract therefore hinges on an interpretation of the term "lead time."

Under North Carolina common law,[5] to succeed on breach of contract claim a party must prove (1) the existence of a valid contract, and (2) breach of its terms. *Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enters., Inc.*, 694 F. Supp. 3d 625, 680 (M.D.N.C. 2023) ("*IWLCA*").  Under the UCC, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such contract," N.C. Gen. Stat. § 25-2-204(a), and it will not fail for indefiniteness even if material terms are left open so long as "the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy," *id.* § 25-2-204(c).

A material breach is a breach that "substantially defeats the purpose of the agreement," "goes to the very heart of the agreement," or "can be characterized as a substantial failure to perform."  *Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 768 S.E.2d 582, 593 (2015).  When a breach is material to the agreement, that breach will

---

[5] The UCC does not explicitly outline the elements of a breach of contract claim.  The common law gap-fills for the UCC when the UCC contains no express provision concerning the matter.  *See* N.C. Gen. Stat. § 25-1-103(b).

typically absolve the counterparty of return performance. *McClure Lumber Co. v. Helmsman Const., Inc.*, 160 N.C. App. 190, 585 S.E.2d 234, 239 (2003); *see also* N.C. Gen. Stat. § 25-2-711(a). Not every breach is material, however, *see Childress v. C. W. Myers Trading Post, Inc.*, 247 N.C. 150, 100 S.E.2d 391, 395 (1957), and the determination as to whether a breach is material is often a question for the jury, *see Supplee*, 768 S.E.2d at 593.

Here, because the parties' arguments for breach are tied to a disputed contract provision, a finding of breach (material or otherwise) is contingent on interpretation of their contract. Contract interpretation requires that a court review the language of the contract to determine the parties' intent at execution. *State v. Philip Morris USA Inc.*, 363 N.C. 623, 685 S.E.2d 85, 90 (2009). At the summary judgment stage, the first step of contract interpretation is determining whether the agreement is ambiguous. *See World-Wide Rts. Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir. 1992); *see also Archer Daniels Midland Co. v. Brunswick County*, 129 F. App'x 16, 23 (4th Cir. 2005) (when sitting in diversity over a contract dispute governed by North Carolina law, federal summary judgment standards control). Then, the Court must then determine if it can interpret the parties' contract without resolving disputed issues of material fact. *World-Wide Rts.*, 955 F.2d at 245. Accordingly, "[s]ummary judgment is appropriate in breach of contract cases when the contract in question is unambiguous or when an ambiguity can be definitively resolved by reference to extrinsic evidence." *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 380 (4th Cir. 2017) (applying North Carolina law) (internal quotations omitted).

21

Summary judgment may be granted as to the interpretation of an unambiguous contract because there are no fact issues to resolve. *World-Wide Rts.*, 955 F.2d at 245; *see also Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C.*, 362 N.C. 269, 658 S.E.2d 918, 921 (2008). The Court is limited to the four corners of an unambiguous contract to resolve the parties' disagreements. *Lynn v. Lynn*, 202 N.C. App. 423, 689 S.E.2d 198, 205 (2010). And ordinarily an unambiguous contract leaves little room for a court to engage in contract interpretation. *See Philip Morris*, 685 S.E.2d at 91 ("[W]hen the terms of a contract are plain and unambiguous, there is no room for construction." (internal quotations omitted)).

If, on the other hand, an agreement is ambiguous, interpretation may require recourse to facts in the record. *See World-Wide Rts.*, 955 F.2d at 245; *see also Crider v. Jones Island Club, Inc.*, 147 N.C. App. 262, 554 S.E.2d 863, 866 (2001). Extrinsic evidence of the parties' intent may be introduced to clarify the agreement's language. *Int'l Paper Co. v. Corporex Constructors, Inc.*, 96 N.C. App. 312, 385 S.E.2d 553, 556 (1989); *see also* N.C. Gen. Stat. § 25-2-202. Summary judgment may still be proper if undisputed extrinsic evidence of the parties' intent resolves a contract's ambiguities. *See World-Wide Rts.*, 955 F.2d at 245; *see also Holly Hill Mall, LLC v. Dunham's Athleisure Corp.*, No. 1:23-cv-547, 2025 WL 361223, at *5 (M.D.N.C. Jan. 31, 2025). But if that extrinsic evidence still leaves the parties' intent unclear or requires resolution of disputed material facts, "interpretation of the contract is for the jury." *Int'l Paper*, 385 S.E.2d at 556; *see also World-Wide Rts.*, 955 F.2d at

22

245 (if "resort to extrinsic evidence … leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact").

The Court is also mindful of some basic principles that guide North Carolina courts when interpreting contracts. An agreement is to be construed using its plain language by giving words their ordinary meanings unless they are specially defined. *IWLCA*, 694 F. Supp. 3d at 684; *see also Crockett v. First Fed. Sav. & Loan Ass'n*, 289 N.C. 620, 224 S.E.2d 580, 588 (1976). Generally, interpretation should avoid constructions that create surplusage—*i.e.*, a court should "construe an ambiguous contract in a manner that gives effect to all of its provisions, if the court is reasonably able to do so." *IWLCA*, 694 F. Supp. 3d at 684 (internal quotation omitted). And, if the contract contains conflicting language, general terms should give way to specific terms. *Id.*

Considering these summary-judgment standards and contract interpretation principles, for the reasons discussed below Redex's motion for summary judgment is denied. The language of the Contract creates ambiguity as to the meaning of "lead time." And extrinsic evidence of the parties' intent creates genuine disputes of material fact that cannot be resolved on summary judgment.

### A. The Contract's Terms are Reasonably Susceptible to Soelect's Interpretation.

Even assuming without deciding that Redex's interpretation of the Contract is reasonable, the Contract is ambiguous because, as Soelect argues, the term "lead time"

23

can be read to have required Redex's complete performance. A contract is ambiguous if it is "fairly and reasonably susceptible to either of the constructions asserted by the parties." *WMC, Inc. v. Weaver*, 166 N.C. App. 352, 602 S.E.2d 706, 712-13 (2004). Even where the terms of a contract appear clear, the specific facts of the case may create ambiguity. *See Galloway as Tr. of Melissa Galloway Snell Living Tr. Dated May 1, 2018 v. Snell*, 384 N.C. 285, 885 S.E.2d 834, 836 (2023). As the North Carolina courts have consistently recognized, the mere fact that the parties even dispute the meaning of their contract "is some indication that the language of the contract is, at best, ambiguous." *AC Devs., LLC v. Edwards*, 300 N.C. App. 1, 919 S.E.2d 762, 766 (2025) (quoting *Dockery v. Quality Plastic Custom Molding, Inc.*, 144 N.C. App. 419, 547 S.E.2d 850, 852 (2001)). That observation rings true here.

The Court begins with the ordinary meaning of the language in the Contract. *Cf. IWLCA*, 694 F. Supp. 3d at 684. The parties focus their dispute on the following language: "Lead time: 12-16 months after receipt of order and down payment." Contract at 2. As both parties understand the phrase, the term "lead time" established a deadline for Redex's performance under the Contract. According to Redex, "[t]he only lead time required by the Contract was delivery of the Machine within 12 to 16 months of the date the down payment was made," *see* Dkt. 27 at 12, because Section 3.4.1 of the Contract granted Redex nine additional months to complete SAT, *see* Dkt. 29 at 8. Soelect instead contends that the "lead time" was intended to encompass Redex's complete performance,

24

including completion of SAT, and that the nine months allotted as part of the "Development agreement" had to occur within the larger 16-month "lead time." *See* Dkt. 28 at 2-3, 15.

The dictionary definitions of "lead time" tend to suggest that the term encompasses Redex's complete performance under the Contract. *See SAS Inst.*, 874 F.3d at 380 ("Courts may resort to dictionaries to identify 'the common and ordinary meaning of words and phrases.'" (quoting *Marcuson v. Clifton*, 154 N.C. App. 202, 571 S.E.2d 599, 601 (2002))). Merriam-Webster defines "lead time" as "the time between the beginning of a process or project and the appearance of its results." *Lead Time*, Merriam-Webster, https://tinyurl.com/mr23s2fw [https://perma.cc/UCT2-T5KA] (last visited May 9, 2026). The American Heritage Dictionary of the English Language similarly defines the phrase as "[t]he time between the initial stage of a project or policy and the appearance of results." *Lead Time*, Am. Heritage Dictionary of Eng. Language, https://tinyurl.com/4eex6nk7 [https://perma.cc/6RN9-FR3Y] (last visited May 9, 2026). While the Oxford English Dictionary takes a broader view of "lead time," defining it as "[t]he time taken to produce some manufactured article," *Lead Time*, Oxford Eng. Dictionary, https://tinyurl.com/yjjnyjfh [https://perma.cc/36H5-9CTV] (last visited May 9, 2026), the definition's usage of "manufactured" to modify the word "article" also suggests that "lead time" contemplates completed, rather than partial, performance.

25

The Contract's language creates ambiguity as to the term "lead time" because elsewhere it appears to suggest—as Redex argues—that Redex may have additional time to complete performance. *See State v. Philip Morris USA Inc.*, 359 N.C. 763, 618 S.E.2d 219, 225 (2005) (contractual meaning is derived not from the meaning of the term in a vacuum, but its meaning in the contract as a whole). The Contract states that "Soelect and [Redex] agree to work together, using their best endeavors[,] to obtain the performance guarantees" outlined in Appendix C2 of the Contract "within 9 months of delivery to the Soelect facility." Contract § 3.4.1. Appendix C2 concerns Final Site Acceptance, and appears to require that the Machine pass a final test to ensure its operability, *see id.*, App'x C2, suggesting that the parties contemplated at the point of execution that the Machine may require additional work from Redex to become completely operable, even outside of the sixteen-month lead time. Proceeding from that assumption, "lead time" may not have required completed performance on Redex's part within sixteen months of Soelect's delivery because nine months were set aside at the back end to ensure the Machine passed SAT.

Other language conflicts with the nine additional months Redex argues that the Contract granted it post-delivery, though. Confusingly, the Contract twice appears to recognize that only thirty days *total* were allotted for the entirety of SAT, *see* Contract at 2 (setting the "[d]uration" of SAT to "30 personnel days"), but that it could be longer "[i]f further visits to site was required by" Redex, *id.* § 3.4.3. Additionally, the nine months

26

set aside as part of the "Development agreement" only concerns "performance guarantees" for Final Site Acceptance, *see id.*, App'x C2, suggesting that at least the first part of SAT, PSAT, still needed to occur within the "lead time" contemplated by the Contract, *see* Contract § 3.4.2 ("If extra parts are required to obtain the performance guarantee[s]" in Appendix C2, Redex will bear design costs and Soelect will bear manufacturing costs); *see also* Dkt. 28 at 14-15 (observing that SAT was to "occur in two stages," PSAT and Final Site Acceptance). That reading is supported by the requirements of PSAT and Final Site Acceptance, which contemplate a progression between the two tests, at least concerning the properties of the extruded lithium foil. *Compare* Contract, App'x C1 (requiring 0.15-millimeter foil) *with id.*, App'x C2 (requiring 0.125-millimeter foil). Redex's reading is especially hard to square with another provision under the "Development agreement" heading that grants Soelect a unilateral right to "terminate the development agreement early and release the final payment term." *Id.* § 3.4.4. If Soelect was always empowered to "terminate the development agreement early," *id.*, it seems unlikely that the parties would have intended Redex to have twenty-five months to complete its performance as a matter of right.

In short, the plain meaning of "lead time" suggests that it was intended to encompass Redex's completed performance under the Contract. While Redex is correct that the contract appears to discretionarily grant it additional time at the back-end as part of the "Development agreement," that language conflicts with competing language that

27

appears to limit the entirety of SAT to thirty days and other provisions that constrain Redex's ability to employ the nine months allegedly granted by the "Development agreement." The limiting language in the "Development agreement" could be harmonized with competing language to generally recognize that Soelect may require additional time to complete its scope of work, but that additional time would only be granted at the discretion of Soelect. So, even if Redex's interpretation is reasonable, Soelect's competing reading of the Contract—that "[b]oth stages of SAT were to be completed within the 16-month lead time," Dkt. 28 at 15—is equally plausible. The contract is thus ambiguous.

**B.      Extrinsic Evidence Cannot Clarify the Parties' Intent Without Resolving Genuine Disputes of Material Fact.**

Even considering evidence extrinsic to the Contract, there is a genuine dispute as to the meaning of "lead time." *See World-Wide Rts.*, 955 F.2d at 245. Construing the facts in the light most favorable to Soelect, there is sufficient extrinsic evidence of the parties' intent in the record that a reasonable jury could return a verdict in Soelect's favor. *See Anderson*, 477 U.S. at 248. That is so because Soelect introduces evidence suggesting that the parties clarified that "lead time" encompassed Redex's complete performance soon after entering into the Contract.

Although Redex minimizes the November 2022 email from its Development Manager, Tighe, that email serves as strong evidence that the parties confirmed their understanding of "lead time" to include Redex's entire course of performance. After

28

Tighe and Cho, Soelect's Founder and CEO, disputed the deadline for Redex's performance only days after the "lead time" began, Tighe stated without qualification that "[w]ork *will be* completed" on the Machine "within 16 months as requested by Jin." Dkt. 28-7 at RED0151 (emphasis added). He added Redex "programmed delivery to site in 2023 with preliminary acceptance in January 2024." *Id.* The schedule Tighe attached to his email unequivocally shows the deadline for the Contract sometime at the beginning of March 2024, with *both* PSAT and Final Site Acceptance occurring before expiration of that deadline. *See* Dkt. 28-2. Tellingly, Redex only attempted to walk back Tighe's reassurances nearly a year later once it became clear that Trinks' delays would cause Redex to exceed the sixteen-month "lead time" that both parties initially concluded (after a short disagreement) would encompass Redex's entire course of performance. *See, e.g.*, Dkt. 28-16 (proposing a revised schedule after learning Trinks would not be able to meet its original timeline for shipping the hydraulic press); Dkt. 28-20 at RED0265 (Speer, Redex's Vice President of Sales, defending the revisions on the ground that Redex's supplier "did not tell the truth" about being able to attain the original shipping schedule for the hydraulic press).

Viewing the facts in the light most favorable to Soelect, a reasonable jury could conclude that the parties confirmed their understanding of "lead time" in November 2022. Because the Court construes the record in the light most favorable to the nonmovant, Soelect, it is unnecessary for the Court to address the extrinsic evidence of

29

intent that Redex offers in connection with its motion for summary judgment because the November 2022 Tighe email is sufficient to create a genuine dispute of material fact for trial. At this stage, it is enough that the Tighe email supports Soelect's reading of the Contract because, viewing the facts in the light most favorable to Soelect, subsequent communication from Redex could be read as attempts to walk back Tighe's earlier assurances once it became clear that Redex could not meet its sixteen-month deadline and Soelect would not give it more time. *See Aleman*, 80 F.4th at 283-84 (court may not resolve factual disputes or draw inferences in favor of the movant). Summary judgment is therefore inappropriate.

## II.     Redex's Arguments Do Not Support Summary Judgment in its Favor.

Redex resists the Court's straightforward conclusion that the ambiguous language of the Contract, as well as the November 2022 Schedule and Tighe's associated email, creates a genuine dispute as to Redex's timing for performance. Redex tries, and fails, to put forth three arguments for why summary judgment may still be granted in its favor on its counterclaims. *First*, it contends that the November 2022 schedule was never a formal modification of the agreement and therefore cannot be considered when interpreting the parties' intent. *See* Dkt. 27 at 6, 12; Dkt. 29 at 7. *Second*, it argues that Soelect breached first by refusing to participate in FAT at its facility in France, a condition-precedent to delivery, absolving Redex of return performance. Dkt. 27 at 10-15. *Third*, it claims that it was not required to strictly comply with the Contract's sixteen-month "lead

30

time."  Dkt. 27 at 15-17.  All three arguments are unpersuasive, and summary judgment is properly denied on Redex's counterclaims.

### A. The Court May Consider the Parties' Course of Performance to Interpret Their Intent.

Redex insists that the November 2022 schedule was never a formal modification to the agreement and therefore could not augment the "lead time" it contends the Contract envisioned.  This argument is meritless.  Redex is correct that the Contract states that no "other agreement or written provisions supersede or modify the terms of [the Contract], unless such agreement or provision is incorporated into [the Contract] in a writing signed and dated by both parties …."  Contract § 5.1.  But the parties did not need to formally modify the Contract.  Their performance under the Contract can serve as evidence of the parties' contractual intent.  *See* N.C. Gen. Stat. § 25-2-202(1) (a contract for the sale of goods "may be explained or supplemented by" the parties' "course of performance"); *id.* § 25-1-303(d) (course of performance "may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement").  Indeed, "the course of actual performance by the parties is considered the best indicator of what they intended the writing to mean."  *Braswell Egg Co. v. Poultry Mgmt. Sys., Inc.*, 481 F. Supp. 3d 528, 538 (E.D.N.C. 2020) (quoting N.C. Gen. Stat. § 25-2-202, cmt. 2).

Redex erroneously proceeds backwards, working from the assumption that the Contract is unambiguous as to the timing of Redex's performance.  Were that the case,

31

subsequent evidence of the parties' intent would not be properly considered by the Court. *See Lynn*, 689 S.E.2d at 205. But, as explained above, the Contract *is* ambiguous, so subsequent evidence of the parties' dealings may be used to resolve ambiguities. *See* N.C. Gen. Stat. § 25-1-303(e). And to the extent that Redex asks this Court to credit its own interpretation of the parties' course of performance, the record reveals that the parties consistently disagreed about the timing of Redex's performance, and the Court may not resolve that factual dispute at this stage when sufficient evidence exists supporting Soelect's contrary view of the facts. *See Aleman*, 80 F.4th at 284. At minimum, there is a genuine dispute as to whether Tighe's email and the November 2022 schedule clarified the parties' understanding of "lead time" or whether Redex's employees correctly determined that the Contract allowed Redex to seek nine additional months.

## B. It is Irrelevant Whether Participation in FAT was a Condition-Precedent to Delivering the Machine to Soelect.

Redex next asserts that it could not have breached the Contract because Soelect breached first by refusing to participate in FAT. It essentially argues that Soelect refused to proceed to FAT, which was a condition-precedent to Redex's return performance to deliver the Machine to Soelect's facility on or before March 2, 2024. *See* Dkt. 27 at 12.

Again, Redex tries to ignore the ambiguities in the parties' Contract and interpret them in its favor. Redex's entire position falls flat on its face unless "[t]he only lead time required by the Contract was delivery of the Machine within 12 to 16 months of the date the down payment was made." *See id*. But the Court is not in the position at this stage to

32

make that determination because the Contract is ambiguous as to the meaning of "lead time," and there is evidence such that a reasonable jury could endorse an interpretation requiring Redex's complete performance on or before March 2, 2024. *See World-Wide Rts.*, 955 F.2d at 245. Accordingly, it is irrelevant whether FAT had to occur before delivery because Redex allegedly breached first by asserting that it would not complete its *entire* performance—*not just delivery*—within the sixteen month "lead time."

Properly viewing the facts in the light most favorable to Soelect, there is a genuine dispute as to whether Redex anticipatorily repudiated its obligation to complete performance on or before March 2, 2024, entitling Soelect to cancellation. Under North Carolina law, anticipatory repudiation "is a positive statement by one party to the other party indicating that [it] will not or cannot substantially perform [its] contractual duties" that occurs "before the time for performance under the terms of the contract" arises. *Millis Const. Co. v. Fairfield Sapphire Valley*, 86 N.C. App. 506, 358 S.E.2d 566, 569 (1987) (emphasis omitted). "When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party" may "resort to any remedy for breach," including cancellation, and "suspend [its] own performance." N.C. Gen. Stat. § 25-2-610(1)-(2); *see also id*. § 25-2-711.

There is ample evidence in the record indicating that Redex made clear it would not complete performance by March 2, 2024. Beginning in November 2023, Redex stated

33

repeatedly and unequivocally that it could not complete its entire performance under the Contract by March 2, 2024, taking the position that the Contract did not require such a deadline. *See, e.g.,* Dkt. 28-20 at RED0257-58, RED0260, RED0265; Dkt. 28-15 at RED0128. It also tried to provide Soelect with updated schedules placing completed performance outside the sixteen-month "lead time." *See* Dkt. 28-16 at RED0124; Dkt. 28-17. And although Soelect offered to amend the Contract to provide Redex more time, Dkt. 28-10, Redex rejected that proposal on the grounds it would allow Soelect to push out payment, *see* Dkt. 25-10. Faced with these repeated "positive statements" from Redex indicating that it could not "substantially perform [its] contractual duties" within the sixteen months allegedly allotted by the Contract, Soelect was "no longer required to … perform under the contract," at least when the facts are viewed in its favor. *See Millis Const.*, 358 S.E.2d at 569. By attempting to seek reassurances from Redex that it would timely perform before eventually cancelling the Contract, Soelect undoubtedly treated Redex's refusal to perform as a breach, as well. *See Profile Invs. No. 25, LLC v. Ammons E. Corp.*, 207 N.C. App. 232, 700 S.E.2d 232, 235 (2010) ("Even a distinct, unequivocal, and absolute refusal to perform is not a breach unless it is treated as such by the adverse party." (quotation modified and internal quotation omitted)). Indeed, Price, Soelect's CFO, declared Redex's position an "evident" breach as early as December 1, 2023, emphasizing the importance to Soelect and its investors that Redex completed performance within the "lead time" window. *See* Dkt. 28-20 at RED0267.

34

Record evidence thus reveals that there is a genuine dispute of material fact as to whether Soelect was correct to deem Redex in material breach of the Contract. *See McClure Lumber*, 585 S.E.2d at 239 (whether a breach is material, for purposes of determining whether the non-breaching party is excused from its obligation to perform further, is ordinarily a question of fact); *see also* N.C. Gen. Stat. § 25-2-610 (repudiation must "substantially impair the value of the contract" to the aggrieved party). There is also a material dispute as to whether that breach entitled Soelect to resort to remedies for breach, N.C. Gen. Stat. § 25-2-610(2), including cancellation of the Contract, *id.* § 25-2-711.

### C. Redex's Arguments Concerning Whether it was Required to Comply with the Contract's Timing Requirements are Meritless.

As a seeming last resort, Redex argues that it was not required to strictly comply with timing requirements in the Contract because the Contract did not explicitly state as such. Redex's arguments are easily rejected. There is a genuine dispute of material fact as to whether the sixteen-month "lead time" imposed a firm deadline on Redex's entire performance. Whether Redex was required to strictly comply with that deadline is a question for the finder of fact because it goes to the materiality of Redex's breach. *See McClure Lumber*, 585 S.E.2d at 239. Redex's two arguments to the contrary are misguided.

Redex first asserts that because the Contract did not expressly deem its performance as "time is of the essence," the Contract did not require strict compliance with performance deadlines. Dkt. 27 at 15. But Redex relies on inapposite North Carolina common law delineating "a well-settled exception" to the "general rule" that "the

35

language of a contract should be interpreted as written" that only "applies to *contracts for the sale of real property*." *See Harris v. Stewart*, 193 N.C. App. 142, 666 S.E.2d 804, 807 (2008) (emphasis added). In such contracts, "it has long been held that in the absence of a 'time is of the essence' provision, time is not of the essence" and "dates stated" in a contract "serve only as guidelines" that do not bind the parties. *Id.* (citing *Douglass v. Brooks*, 242 N.C. 178, 87 S.E.2d 258, 263 (1955)). But the Contract is *not* a contract for the sale of real property (much less governed by North Carolina common law by default), and Redex provides no support for the proposition that the exception recognized in *Harris* has been applied beyond contracts for the sale of real estate. To the contrary, North Carolina courts have expressly declined to do so. *See, e.g.*, *Yoder v. Verm*, No. 23-cvs-001820-440, 2025 WL 1314303, at *8 (N.C. Super. Ct. May 6, 2025) (rejecting proposition that *Harris* or related decisions applied outside the context of contracts for the sale of real property).

Based on the Court's own research, the North Carolina Court of Appeals has only once applied *Hunter* to a contract governed by Article 2 of the UCC—there, a contract for the sale of a boat—but the facts of the case are distinguishable. *See D.G. II, LLC v. Nix*, 211 N.C. App. 332, 712 S.E.2d 335, 341-42 (2011). For one, the sale of the boat, which involved a closing and transfer of title, closely mirrored a contract for the sale of real property. *See id.* at 342. But even more fundamentally, as explained above, unlike the plaintiff in *Nix*, who "never declared that defendants were in default" for failure to meet the closing deadline and "took actions manifesting an intent that the closing could occur

36

at a later date," *id.*, Soelect repeatedly and consistently told Redex that completed performance after March 2, 2024 was unacceptable.  While the Court agrees with *Yoder* that it is doubtful that the exception recognized in *Hunter* extends beyond contracts for the sale of real property, even under *Nix*, Redex's arguments are unpersuasive.  *See Nix*, 712 S.E.2d at 341-42 ("[F]or time to be of the essence, it must be so stated in the contract, or the court must 'find anything in the contract or in the *parties' actions* which demonstrate their intent to make time of the essence.'" (quoting *Johnson v. Smith, Scott & Assocs., Inc.*, 77 N.C. App. 386, 335 S.E.2d 205, 207 (1985) (emphasis added)).

Redex also contends that the UCC's default rule of performance within "a reasonable time" dictates that it was not required to strictly comply with the sixteen-month "lead time."  Dkt. 27 at 16 (citing N.C. Gen. Stat. § 25-2-309).  It is true that under the UCC "[t]he time for shipment or delivery or any other action under a contract *if not … agreed upon* shall be a reasonable time."  N.C. Gen. Stat. § 25-2-309(a) (emphasis added).  But the rule is nothing more than a default presumption.  *See Maxwell v. Michael P. Doyle, Inc.*, 164 N.C. App. 319, 595 S.E.2d 759, 764 (2004) (where a contract is silent on the timing of performance, a "reasonable time" limitation will be inferred).  Here, both parties agree that the "lead time" provision *does* supply some sort of timing requirement on Redex's performance, they only disagree about what performance was covered by it.  The parties' express timing provision displaces the default presumption.  *See* N.C. Gen. Stat. § 25-2-309, cmt. 1; *see also Wall Recycling, LLC v. 3TEK Global, LLC*, No. 22-1271, 2024 WL 3594697,

37

at *5 (4th Cir. July 31, 2024). And, in any event, the finder of fact could still infer a "definite time" for Redex's performance "from the contractual circumstances, usage of trade or course of dealing or performance," even if the Contract was silent on timing (which both parties agree it is not). *See* N.C. Gen. Stat. § 25-2-309, cmt. 1.

Redex's attempts to read terms into the Contract concerning its timing of performance must be rejected. Redex's motion for summary judgment on its counterclaims is accordingly denied.

## III. Redex is Not Entitled to Summary Judgment on Soelect's Claims.

Redex is not entitled to summary judgment on Soelect's claims, either. As explained above, Soelect has met its burden to demonstrate genuine disputes of material fact as to whether: (1) Redex was required to complete its entire performance within the Contract's sixteen-month "lead time;" (2) Redex materially breached the Contract by anticipatorily repudiating that alleged deadline; and (3) Redex's breach entitled Soelect to cancel the Contract and recover for damages. These are all questions of fact properly left to a jury because the ambiguities that must be addressed to answer them cannot be resolved without resorting to disputed evidence. *See World-Wide Rts.*, 955 F.2d at 245. All three genuine disputes of material fact impact the resolution of Soelect's claims for breach of contract and unjust enrichment, just like Redex's competing counterclaim for breach of contract.

38

A reasonable jury could return a verdict in favor of Soelect that Redex materially breached the Contract by unequivocally stating that it would not complete performance by March 2, 2024. Redex's attempts to read clarity into barebones and ambiguous contract language, ignore subsequent evidence of intent, and minimize unfavorable or conflicting evidence does not convince the Court otherwise. So, for the reasons stated in this Memorandum Opinion and Order, Redex's motion for summary judgment is DENIED.

It is SO ORDERED.

This the 10th day of June, 2026.

LINDSEY A. FREEMAN
UNITED STATES DISTRICT JUDGE

39